# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **ABIGAIL BUSLER, CARL KIRKSEY,**<br>**and CHANTEL YOUNG, individually and on**<br>**behalf of all others similarly situated,** | )<br>)<br>) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **NISSAN NORTH AMERICA, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

    **Case No. 3:22-cv-00769**
    **Judge Aleta A. Trauger**

## MEMORANDUM

Nissan North America, Inc. ("Nissan") has filed a Motion to Dismiss Plaintiffs' Amended Class Action Complaint (Doc. No. 41), to which the plaintiffs have filed a Response (Doc. No. 45), and Nissan has filed a Reply (Doc. No. 46). For the reasons set out herein, the motion will be granted in part and denied in part.

## I. BACKGROUND[1]

### A. Nature of the Case

This is a putative class action regarding certain vehicles manufactured by Nissan from the 2016 model year through the 2022 model year. (Doc. No. 38 ¶ 1.) The plaintiffs allege that, due to "one or more design and/or manufacturing defects," the Xtronic Continuously Variable Transmission ("CVT") found in those vehicles exhibited several undesirable and potentially dangerous tendencies:

> [The CVT] causes sudden, unexpected shaking and violent jerking (commonly referred to as "juddering" or ["]shuddering") when drivers attempt to accelerate

---

[1] Unless otherwise indicated, these facts come from the plaintiffs' Amended Class Action Complaint (Doc. No. 38) and are taken as true for the purposes of the pending motion.

their vehicles; it causes the vehicle to lag or delay when the driver tries to accelerate, causing an unsafe, unpredictable acceleration; it exhibits a hard deceleration or "clunk" when drivers either slow down or accelerate at low speeds; it causes complete transmission failure in the middle of roadways and it suffers catastrophic failure, necessitating replacement.

(*Id.* ¶ 4.)

The plaintiffs describe the CVT as follows:

The CVT is an automatic transmission that uses two variable-diameter pulleys with a steel belt running between them to change speed, instead of a gearbox and clutch system. Rather than relying on the fixed gear ratios of the traditional automatic transmission, the pulleys can adjust their width to make the belt turn faster or slower, depending on the speed of the vehicle and the torque needed. The CVT thus "simultaneously adjusts the diameter of the 'drive pulley' that transmits torque from the engine and the 'driven pulley' that transfers torque to the wheels" to allow for an infinite number of gear ratios. In theory, the CVT chooses the gear ratio optimum for driving conditions.

(*Id.* ¶ 58.) The plaintiffs assert that the "selection of the gear ratio by the CVT is defective" in a way that causes the vehicle to "take an inordinately long time to accelerate from a stop or low speed, exhibit a hard deceleration or 'clunk' when drivers either slow down or accelerate at low speeds, shudder and shake or make a loud clunking or knocking sound when the CVT finally selects the appropriate gear ratio, and completely fail to accelerate." (*Id.* ¶ 61.) They do not, however, offer a more detailed mechanical account of how or why the process of selecting a gear ratio exhibits these types of malfunctions. (*Id.*)

**B. History of the CVT Issue**

The vehicles at issue were sold with either a 5-year, 60,000-mile or 6-year, 70,000-mile Nissan powertrain warranty that, according to the plaintiffs, "purported to cover the CVT." (*Id.* ¶ 5.) The plaintiffs say that they "are informed and believe that[,] since 2015, if not earlier, Nissan has been aware that" the CVT "would cause the symptoms" described by the plaintiffs and that the CVT "would require frequent replacement, including replacements just outside of warranty,

2

[and] that the replacement transmissions installed would be equally defective as the originals." (*Id.* ¶ 12.) The plaintiffs have identified Nissan Technical Service Bulletins, or "TSBs," dating back to 2013 in which the company acknowledged issues with Nissan transmissions that, according to the plaintiffs, were attributable to the same defect or defects that form the basis of this case. (*Id.* ¶¶ 12–15.)

The National Highway Traffic Safety Administration ("NHTSA") "requires manufacturers to submit [certain] information regarding vehicle safety issues." *Schall v. Suzuki Motor of Am., Inc.*, No. 4:14-CV-00074-JHM, 2020 WL 1225047, at *4 n.1 (W.D. Ky. Mar. 12, 2020) (citing 49 C.F.R. § 579). NHTSA also has an Office of Defects Investigation ("ODI"), to which consumers or others can complain directly. *See* 49 C.F.R. § 554.5. According to the plaintiffs, "[a]ll automobile manufacturers routinely monitor and analyze NHTSA complaints," which, for several years, included complaints about the CVT. (*Id.* ¶ 68; *see* Doc. No. 38-1 (collection of complaints).) Accordingly, the plaintiffs suggest, Nissan either actually knew or, by ordinary industry practice, should have known about the problems. (*Id.*)

The plaintiffs also allege that Nissan was privy to non-public information that gave it a "superior and exclusive" awareness of the problems. (Doc. No. 38 ¶ 70.) Specifically, the plaintiffs allege that Nissan received information about the malfunctions from

> pre-release testing data, early customer complaints to Nissan and its dealers who are their agents for vehicle repairs, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to Nissan's network of dealers and directly to Nissan, aggregate warranty data compiled from Nissan's network of dealers, testing conducted in response to those complaints, high failure rates and replacement part sales data received by Nissan from Nissan's network of dealers, customer complaints to NHTSA (which Nissan monitors), by developing technical service bulletins in an effort to address the CVT Defect, and through other aggregate data from Nissan dealers about the problem.

(*Id.* ¶ 71.)

The plaintiffs allege that, as Nissan became increasingly aware of the problems with the CVT, it took steps to actively conceal them. (*Id.* ¶ 94.) Specifically, the plaintiffs state that, "[w]hen customers present their Class Vehicles to an authorized Nissan dealer for CVT repairs, rather than repair the problem under warranty, Nissan dealers either inform customers that their Vehicles are functioning properly or conduct repairs that merely mask the CVT Defect." (*Id.* ¶ 95.)

## C. The Plaintiffs

Abigail Busler purchased a certified pre-owned 2019 Nissan Kicks in August of 2020 from a Tucson, Arizona-based Nissan dealership. (*Id.* ¶ 21.) Her car began experiencing transmission difficulties—specifically, a "lack of motive power and delayed and insufficient acceleration"— within about four months of the purchase. (*Id.* ¶ 25.) In January of 2022, Busler returned to the dealership complaining of the problem, but the dealership "failed to perform any repairs," and her vehicle's difficulties with acceleration have continued. (*Id.* ¶ 26.) Busler says that, if she had known about the transmission problems with the 2019 Nissan Kicks, she "would not have purchased the Vehicle, or would have paid less for it." (*Id.* ¶ 24.)

Carl Kirksey, who lives in Alabama, purchased a pre-owned 2016 Nissan Maxima from online dealership Vroom in December of 2021. (*Id.* ¶ 29.) Not long after the purchase, Kirksey's Maxima "began to suddenly and repeatedly lose motive power, including on the freeway." (*Id.* ¶ 33.) In February of 2022, he took the vehicle to a local dealership, which told him that he needed a new CVT and new alternator. Kirksey complied with the dealership's recommendation and paid for the replacement—partly out of pocket and partly pursuant to an extended warranty he had purchased. Even after the replacement, however, his vehicle has "continued to run rough and jerk." (*Id.* ¶¶ 34–35.) Like Busler, Kirksey says that, if he had known about the issues with the CVT, he would not have purchased the vehicle or would only have done so at a lower price. (*Id.* ¶¶ 31–32.)

4

Chantel Young purchased a new 2021 Nissan Kicks in April of 2021 from a Tifton, Georgia-based Nissan dealership. (*Id.* ¶ 37.) Within a few months, she began to notice "jerking" and "skipping" when trying to accelerate. (*Id.* ¶ 41.) In February of 2022, she took her vehicle to the dealership to have the problems assessed, and they told her that the "entire CVT assembly needed to be replaced." (*Id.* ¶ 42.) Young had the replacement done, but her vehicle "continues to run roughly," and she believes that it is "likely" that she will need another CVT replacement. (*Id.* ¶ 43.) Young makes the same claims as the other named plaintiffs about not purchasing or paying less for her vehicle if she had known about its problems. (*Id.* ¶ 40.)

**D. Procedural History**

On September 30, 2022, the plaintiffs—along with four other plaintiffs who are no longer part of the case—filed their initial Class Action Complaint. (Doc. No. 1.) The plaintiffs filed an Amended Class Action Complaint on February 7, 2023. (Doc. No. 38.) They state nine counts, some of which are on behalf of all three plaintiffs and the putative class as a whole, and some of which are on behalf of individual plaintiffs and state-based subclasses. Counts I, II, and III are on behalf of all plaintiffs and state claims for, respectively, breach of express warranty, breach of implied warranty, and violation of the Magnuson-Moss Warranty Act. (*Id.* ¶¶ 116–149.) Counts IV, V, and VI state plaintiff-specific claims under the respective consumer protection statutes of Alabama, Arizona, and Georgia. (*Id.* ¶¶ 150–97.) Count VII adds a claim under a second Georgia statute, the Georgia Uniform Deceptive Trade Practices Act. (*Id.* ¶¶ 198–215.) Counts VIII and IX are on behalf of all plaintiffs and state claims for unjust enrichment and fraudulent omission, respectively. (*Id.* ¶¶ 216–29.) On March 20, 2023, Nissan filed a Motion to Dismiss directed at all claims. (Doc. No. 41.)

5

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Additionally, Rule 9(b) of the Federal Rules of Civil Procedure states that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This standard applies to all claims that "sound in fraud," including statutory claims incorporating fraud principles. *Ind.State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v.*

6

*Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009). Generally speaking, a plaintiff seeking to comply with Rule 9(b) must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)). This heightened pleading standard is designed to prevent "fishing expeditions," to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (quoting *U.S. ex rel. SNAPP, Inc. v. Ford Motor Company*, 532 F.3d 496, 503 n.11 (6th Cir. 2008)). However, the Sixth Circuit has explained that Rule 9(b) "should not be read to defeat the general policy of simplicity and flexibility in pleadings contemplated by the Federal Rules." *SNAPP*, 532 F.3d at 504. "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.*

### III. ANALYSIS

#### A. Breach of Express Warranty (Count I)

The mere fact that a vehicle covered by a warranty has malfunctioned does not, alone, support recovery for breach of express warranty. The plaintiff must also show that the defendant received "(1) notice of the defect and (2) a reasonable opportunity to repair the defect." *Knight v. Am. Suzuki Motor Corp.*, 272 Ga. App. 319, 322, 612 S.E.2d 546, 549 (2005) (collecting authorities). Nissan argues that some of the plaintiffs "cannot pursue express warranty claims," as set out in Count I, "because they cannot show presentment for repair during the warranty period

7

and a refusal or failure to repair by the dealer." (Doc. No. 42 at 1.) The plaintiffs respond that the Amended Complaint clearly alleges that each plaintiff took his or her vehicle to a Nissan dealership and either (1) was provided no repairs or (2) was provided ostensible repairs that did not address the underlying problems.

Nissan does not appear to have any meaningful argument that Busler's claim should fail in this regard. Busler has specifically alleged that she took her vehicle to a dealership during the vehicle's warranty period and informed the dealership of the problems she was experiencing, in response to which the dealership "failed to perform any repairs." (Doc. No. 38 ¶ 26.) Such an allegation constitutes a straightforward claim of violating the warranty. Nissan has accordingly presented no specific argument that Busler's presentment of her vehicle was insufficient to support Count I and has instead focused on Young and Kirksey.

Young, like Busler, alleges that she brought her vehicle to a dealership within its warranty period and informed the dealership of the vehicle's problems. Young's dealership, however, did not entirely fail to perform any work on the car; rather, the dealership performed a full replacement of her CVT assembly. Young asserts, however, that her vehicle "continues to run roughly" and that she is "likely" to need another replacement. (*Id.* ¶¶ 42–43.) Nissan points out that Young has not asserted that she returned to the dealership with those current problems. Accordingly, Young must rely on her first attempt in order to satisfy the requirement of a reasonable opportunity to repair followed by a failure to repair.

Nissan has not identified any Georgia caselaw or statutory law suggesting that a breach of express warranty claim requires that the warrantor have outright refused to perform services on the relevant vehicle. To the contrary, the ordinary meaning of "fail to repair" would include both (1) outright refusals to repair and (2) the performance of ostensible repairs that did not resolve the

8

complained-of problem. Courts that have considered such questions, moreover, appear to have largely concluded that whether a warrantor's ineffective repairs amounted to a failure to repair for warranty purposes presents a factual question. *See, e.g.*, *Milisits v. FCA US LLC*, No. 20-CV-11578, 2021 WL 3145704, at *5 (E.D. Mich. July 26, 2021); *Razen v. FCA US LLC*, No. 6:19-cv-831-Orl-40LRH, 2019 WL 7482214, at *5 (M.D. Fla. Oct. 23, 2019); *Jones v. Fleetwood Motor Homes*, 127 F. Supp. 2d 958, 965 (N.D. Ill. 2000); *Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164, 1184, 190 Cal. Rptr. 3d 411, 428 (2015). Reading the facts of the Amended Complaint in the light most favorable to Young, the court finds that she has sufficiently pleaded that the dealership failed to repair her vehicle. Similarly, while a jury might ultimately conclude that Young's one attempt at obtaining adequate repairs was not a sufficient opportunity to repair, the court cannot assume that that is the case at this stage. Nissan's arguments for dismissing Young's express warranty claim therefore fail.

Nissan makes two arguments regarding the sufficiency of Kirksey's presentation of his vehicle to a dealership for repair. The first argument is largely the same as the one that Nissan put forward with regard to Young, and it fails for the same general reasons. Nissan's second argument, however, is unique to Kirksey. Nissan argues that, when Kirksey presented his 2016 vehicle for service in 2022, it no longer could have been within the five-year powertrain warranty that covered the CVT. In the plaintiffs' Response, they do not dispute that, if Kirksey had relied on a five-year warranty issued in 2016, the warranty would have expired before he sought service. Rather, they point out that the Amended Complaint alleges that Kirksey's vehicle "was covered by the extended warranty that Mr. Kirksey had purchased." (Doc. No. 38 ¶ 34.)

As Nissan points out, however, the plaintiffs' language conspicuously fails to state whether that extended warranty that Kirksey purchased was actually a Nissan warranty. Nissan says that it

9

was not, and it suggests that the extended warranty was likely purchased from Vroom, the online dealership from which Kirksey originally bought his vehicle.

The defendants identify language from Vroom's website appearing to confirm that it does, in fact, offer such warranties, but it is questionable whether the court can consider such evidence at this stage. Generally speaking, the court can consider the text of documents mentioned in a complaint and integral to a plaintiff's claims without transforming a Rule 12(b)(6) motion into a motion for summary judgment. *See Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011) (citation omitted). Accordingly, if the court had a copy of Kirksey's extended warranty, it could consider that copy. Nissan, however, has not been able to produce the actual warranty and has instead relied on evidence that merely suggests what that warranty might say. Taking such a step—even if only to reconstruct a document that the court could appropriately consider, if it were in the record—would arguably go beyond the court's highly circumscribed power to look beyond the four corners of the complaint in connection with Rule 12(b)(6).

In this instance, though, there is no need to reach a conclusion regarding whether such a step would be permissible, because the Amended Complaint itself contains the very deficiency on which the defendants rely, removing any need to look elsewhere. The Amended Complaint does not affirmatively state that Kirksey's warranty was issued by Vroom, but Nissan's defense is not based on the contention that Kirksey's warranty *was* a Vroom warranty, but rather that it *was not* a Nissan warranty. The Amended Complaint does, as Nissan argues, fail to actually allege that the warranty at issue was one that was issued by, or in any way imposed an obligation on, Nissan. Kirksey's description of the warranty's functioning is, moreover, consistent with the possibility that it was not a direct manufacturer's warranty. Specifically, Kirksey asserts that he "had to pay $637 out of pocket for these repairs" and that "the remainder was covered by the extended

10

warranty." (Doc. No. 38 ¶ 34.) That language suggests that the administrator of the warranty was acting primarily as a payor—as one would expect with a third-party warranty.

Under Alabama law, "[e]xpress warranties should be treated like any other type of contract and interpreted according to general contract principles." *Barko Hydraulics, LLC v. Shepherd*, 167 So. 3d 304, 310 (Ala. 2014) (citing *Ex parte Miller*, 693 So. 2d 1372, 1376 (Ala. 1997)). Consistently with that rule, the Alabama Supreme Court has turned to ordinary contract law principles to determine the extent to which a warranty can be construed to affect the rights of third parties. *See, e.g.*, *Bay Lines, Inc. v. Stoughton Trailers, Inc.*, 838 So. 2d 1013, 1019–20 (Ala. 2002). The Amended Complaint, as drafted, does not assert any basis for concluding that the never-described extended warranty that Kirksey purchased from an unidentified seller actually imposed any obligation on Nissan, and that failure to assert any obligation is, by extension, a failure to assert a breach. The court will therefore dismiss Count I as to Kirksey.

**B. Breach of the Implied Warranty of Fitness/Merchantability (Count II)**

Each of the three states at issue in this case has adopted the Uniform Commercial Code's ("UCC") ordinary implied warranty of merchantability, which includes a guarantee that the goods sold are "fit for the ordinary purposes for which such goods are used." Ala. Code § 7-2A-212(2)(c); Ariz. Rev. Stat. Ann. § 47-2314(B)(3); Ga. Code Ann. § 11-2A-212(2)(c). Count II is premised on Nissan's alleged violation of that implied warranty of fitness for ordinary use with regard to vehicles containing the allegedly defective CVT. Nissan argues that the court should dismiss that count because, among other things, the plaintiffs' allegations, even if true, would only mean that their vehicles performed worse than expected—not that they were wholly unfit for ordinary use. In the plaintiffs' Response, Busler and Kirksey "withdraw" their implied warranty of merchantability claims, and the court will therefore dismiss Count II as asserted by those plaintiffs.

11

(Doc. No. 45 at 20 n.7.) Young, however, continues to argue that she has sufficiently pleaded a claim for the violation of the implied warranty of merchantability under Georgia law.

There are, of course, many things that can go wrong with a car, ranging from minor inconveniences to catastrophic failures. Courts, accordingly, have developed caselaw to distinguish truly unfit vehicles from ones that are merely disappointing or marred by some more limited defect. For example, "'[t]he weight of authority, from courts across the country," is that, if plaintiffs have "driven their cars without problems for years," then they typically "may not recover for breach of the implied warranty of merchantability.'" *Sheris v. Nissan N. Am. Inc.*, No. CIV. 07-2516 (WHW), 2008 WL 2354908, at *6 (D.N.J. June 3, 2008) (quoting *In re: Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, No. 96-1814(JBS), 2001 WL 1266317, at *22 (D.N.J. Sept. 30, 1997) & collecting cases).

That rule does not apply here, because Young has alleged that she did, in fact, experience actual problems with her car not long after she bought it. Specifically, Young began to experience "jerking" and "skipping" within "a few months" of her vehicle's April 2021 purchase date, although she apparently did not consider the problem sufficiently severe to warrant bringing the vehicle to the dealership until February of 2022. (*Id.* ¶¶ 41–42.) The fact that Young experienced some problems, however, does not necessarily mean that her vehicle was unfit for use. Young alleges that, after the replacement, her vehicle "continues to run roughly," but there is no allegation that she has abandoned using the car. (*Id.* ¶ 43.) She also does not assert that she categorically would have been unwilling to purchase the vehicle if the transmission issues had been exposed— only that she "would not have purchased the Vehicle, *or would have paid less for it*." (*Id.* ¶ 40 (emphasis added).)

The plaintiffs argue that Nissan's contention that the vehicles were fit for their primary purpose ignores the real and serious safety considerations associated with transmission malfunctions of the types that the plaintiffs have identified. As the Amended Complaint explains:

> Hesitations, slow/no responses, hard braking or catastrophic transmission failure impair drivers' control over their vehicles, which significantly increases the risk of accidents. For example, turning left across oncoming traffic in a vehicle with delayed and unpredictable acceleration is unsafe. In addition, these conditions can make it difficult to safely change lanes, merge into traffic, turn, brake slowly or accelerate from stop light/sign, and accelerate onto highways or freeways.

(Doc. No. 38 ¶ 65.) These safety considerations, the plaintiffs argue, rendered Young's vehicle unfit for ordinary use.

The defendants point out that some courts have suggested that, for safety considerations to be sufficient to render a vehicle unfit, they must be significant enough to cause the driver to "actually stop[] driving his vehicle." *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 762 (E.D. Mich. 2017) (collecting cases). However, abandoning a vehicle that a person has already purchased may be easier said than done—particularly in the automobile-centered culture of the modern United States—and the defendants have not identified any Georgia authority actually requiring a driver pursuing an implied warranty of fitness claim to show that she stopped driving the underlying vehicle altogether. As the U.S. District Court for the Middle District of Alabama recently observed, "[n]either [the relevant] authority nor common sense support[s] the proposition that a vehicle is merchantable so long as it provides transportation, regardless of any other problems with the vehicle." *Hurry v. Gen. Motors LLC*, 622 F. Supp. 3d 1132, 1148 (M.D. Ala. 2022). This issue, therefore, is not amenable to an easy resolution based on the assumption that, simply because Young continued to drive her vehicle, then the vehicle must have been fit to drive. The court therefore must consider the nature of the specific problems alleged.

13

Young has alleged that, when her vehicle first exhibited transmission problems, it did so by "jerking and exhibiting a skipping sensation when attempting to accelerate." (Doc. No. 38 ¶ 41.) The plaintiffs argue that these allegations are sufficient to state a plausible claim that the vehicle was unfit for its ordinary purpose. *See Costa v. Nissan N. Am., Inc.*, No. CV 18-11523-LTS, 2019 WL 267463, at *3 (D. Mass. Jan. 18, 2019) (refusing to dismiss CVT-related implied warranty claim because "[t]he severity of these issues and the extent to which they may have rendered the vehicle unmerchantable is a question of fact") (quoting *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 977 (N.D. Cal. 2018)). Although the court finds this to be a close question, it ultimately agrees. The potential safety implications of unreliable acceleration are obvious and serious. The fact that Young was apparently able to use her vehicle despite the problems it experienced may well pose an obstacle to her ultimate prevailing on this theory, but the court cannot conclude that her claim that the vehicle was unmerchantable is so implausible that it supports dismissal under Rule 12(b)(6). The court therefore will dismiss Count II only as to Busler and Kirksey.

### D. Magnuson-Moss (Count III)

The Magnuson–Moss Warranty Act "creates a federal right of action for violation of the Act's terms, as well as for breaches of warranty arising from state substantive law." *Kuns v. Ford Motor Co.*, 543 F. App'x 572, 575 (6th Cir. 2013) (15 U.S.C. § 2310(d)(1)). Unless a plaintiff is pursuing a claim premised on the violation of a specific Magnuson-Moss requirement, "the elements that a plaintiff must establish to pursue a cause of action . . . are the same as those required by" state law for a breach of warranty claim. *Id.* Nissan argues that the court should therefore dismiss Count III for the same reasons that it identified with regard to Counts I and II.

14

The court has held that Busler and Young have sufficiently asserted claims for breach of express warranty. Nissan has therefore identified no basis for dismissing Count III, as asserted by them. The court's conclusion that Kirksey has failed to state an actionable claim for breach of either express or implied warranty against Nissan, however, necessitates the dismissal of Count III as to him. The Magnuson-Moss claims in this case are wholly derivative of the relevant warranties. Because Kirksey has failed to allege that his vehicle was covered by a warranty that (1) remained in effect when he sought repairs and (2) imposed any obligation on Nissan, the court will dismiss Count III as to him.

## E. State Consumer Protection Statutes (Counts IV, V, VI, and VII)

### 1. Failure to Identify a Defect

Nissan argues that the court should dismiss the claims based on state consumer protection statutes on the ground that the plaintiffs have failed to identify any "specific defect." (Doc. No. 42 at 12.) Nissan argues that the plaintiffs' theory of the case consists, in large part, of (1) identifying the vehicle component at issue—the CVT—and (2) describing various symptoms that are, because of their nature, apparently transmission-related and therefore attributable to that part. This approach, Nissan complains, falls short of identifying any actual defect—for example, by describing a specific physical malfunction that the CVT experiences, resulting in a discrete and identifiable product failure. Nissan complains that, rather than targeting an actual, identifiable defect, the plaintiffs are, in effect, "try[ing] to attribute virtually any problems that a consumer may experience with vehicle drivability to the so-called but unspecified 'CVT defect.'" (*Id.* at 1) Nissan argues that the court should dismiss Counts IV through VI (as well as Count IX, which the court will discuss later in the opinion) based on this flaw.

A review of the Amended Complaint confirms that, while the respective state statutes at issue in Counts IV, V, and VI differ in some regards, each of the relevant counts does hinge on the alleged existence of a CVT defect. (*See* Doc. No. 38 ¶¶ 157, 173, 182.) The defendants, moreover, are correct that courts considering automobile defect cases typically require at least some level of meaningful detail regarding what the defect that the plaintiffs have alleged actually is—as opposed to simply the symptoms that it has caused. For example, *in Browning v. Am. Honda Motor Co.*, 549 F. Supp. 3d 996 (N.D. Cal. 2021), a federal district court dismissed claims brought by plaintiffs who, like these, alleged that their vehicles' transmission was "defective" because it caused certain unacceptable symptoms, but who "failed to plead facts beyond the symptoms of the alleged defects." *Id.* at 1006.

The court did not hold that the plaintiffs were required to plead an exhaustive account of the physical processes at issue. The court concluded, however, that a plaintiff must, at a minimum, "identify the particular part affected by the defect and the [defect's] symptoms." *Id.* at 1006 (citing *Clark v. Am. Honda Motor Co.*, 528 F. Supp. 3d 1108, 1115 (C.D. Cal. 2021)). The court held that the first of those requirements—identifying the "part affected"—required a greater level of specificity than simply "identify[ing] the [t]ransmission as the system affected by the defect," which "similarly situated courts ha[d] found . . . to be too general." *Id.* (citing *Callaghan v. BMW of N. Am., LLC*, No. 13-CV-04794-JD, 2014 WL 6629254, at *3 (N.D. Cal. Nov. 21, 2014); *DeCoteau v. FCA US LLC*, No. 215-CV-00020-MCE-EFB, 2015 WL 6951296, at *3 (E.D. Cal. Nov. 10, 2015)). The court noted that a transmission "is composed of innumerable component parts and interrelated systems" and that merely attributing a problem to the transmission system as a whole did little to give the defendant notice of what aspect of the transmission was actually alleged to contain a defect, let alone what the defect actually was. *Id.*

These plaintiffs have gone a step further than simply identifying their vehicles' transmission systems as the site of the underlying defects, in that they have specifically alleged that the problems that they have identified arise out of the CVT's selection of variable gear ratios, which, the plaintiffs assert, has resulted in problems that would not occur otherwise. The court does not wish to overstate the extent of the additional detail that the plaintiffs have provided; after all, management of gear ratios is what a transmission does, *see Ekstrom v. United States*, 21 F. Supp. 338, 344 (Ct. Cl. 1937), and alleging that the gear ratios are not working is only a bit more detailed than simply saying that the transmission system is defective. Insofar as the persuasive authorities that Nissan cites propose a bright-line rule whereby a plaintiff must do more than simply identify the transmission system as the problem, however, these plaintiffs have done enough to overcome that bright-line rule by specifically linking these problems to the selection of variable gear ratios and identifying the specific subcomponents involved in that process. (*See* Doc. No. 38 ¶¶ 57–61 & fig.1.)

It is true that the Amended Complaint still leaves much unsaid regarding how and why the CVT malfunctioned in the ways that it allegedly did. There is a difference, though, between identifying a defect, as is required, and fully explaining that defect, which is not. *See Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1237 n.60 (C.D. Cal. 2011) ("Plaintiff is not required to plead the mechanical details of an alleged defect in order to state a claim."). As a simplified example, one can imagine a hypothetical manufacturer choosing between two product materials—Material A and Material B—that are substantively identical in every way, except for the fact that Material B, for reasons entirely mysterious to the manufacturer, has a tendency to shatter into dangerous shards during normal use of the product. No reasonable person would argue that the manufacturer would be justified in using Material B simply because the manufacturer did

17

not know, on some molecular level, *why* it was dangerous. What matters is that the manufacturer knew of the risk, knew there was an alternative, and took the risk anyway. Ordinary products liability law would not prevent a plaintiff from suing based on the selection of Material B, simply because no one knew precisely why Material B failed in the ways that it did.

The CVT design that Nissan used in the plaintiffs' vehicles is, suffice it to say, not the only transmission design in existence. The Amended Complaint clearly alleges that (1) alternative transmission options were feasible and available and (2) those other designs would not have resulted in the malfunctions of which the plaintiffs complain. The plaintiffs have explained the physical process (variable gear ratio selection) and parts (the belt and pulley system that adjusts the gear ratio) involved in the manifestation of the symptoms at issue, even if they have not gone into further detail. Those allegations are sufficient to put Nissan on particularized notice regarding the alleged defect. The court therefore will not dismiss Count IV, V, or VI for a failure to identify the relevant defect.

### 2. Failure to Allege Prior Knowledge of the Defect

Each of the plaintiffs' state consumer protection claims includes allegations that Nissan knew about the CVT defect but permitted the vehicles to be sold regardless. (Doc. No. 38 ¶¶ 157, 173, 182–85.) The plaintiffs have supported this aspect of their allegations with both (1) general evidence demonstrating why it would be unlikely for Nissan to have remained ignorant of the CVT problem in light of its ongoing monitoring practices and (2) specific evidence, such as Nissan's service bulletins and NHTSA complaints to which Nissan had access, demonstrating actual knowledge of at least some aspects of the CVT problems. (Doc. No. 38 ¶¶ 70–93.) Nissan nevertheless argues that these allegations are insufficient because the plaintiffs have not identified sufficiently persuasive evidence of Nissan's actual pre-sale knowledge of the defect.

18

Nissan bases that argument in significant part on *Smith v. Gen. Motors LLC*, 988 F.3d 873, 875 (6th Cir. 2021), in which the Sixth Circuit affirmed a district court dismissal of auto defect claims based on a failure to sufficiently allege knowledge. The plaintiffs in *Smith*, like these plaintiffs, relied on the vehicle manufacturer's ongoing monitoring of customer complaints in order to support an inference of knowledge, and the Sixth Circuit concluded that the plaintiffs' allegations were, in that instance, insufficient. *Id.* at 883–85. The Sixth Circuit, however, did not hold that such a theory of prior knowledge categorically must fail. Rather, the Sixth Circuit based its conclusion on a specific deficiency in the history of customer complaints alleged. *Smith* involved allegedly defective dashboards that tended to crack and, potentially, "cause severe injuries because malfunctioning airbags could turn the plastic dashboards into deadly projectiles during a crash." *Id.* at 875. The Sixth Circuit concluded that the relevant customer complaints were insufficient to establish knowledge of dangerousness because they, at most, made the manufacturer aware of the first, far less serious aspect of the problem—cracks in the dashboard—but not "the safety implications of the dashboard defect." *Id.* at 885. In other words, the court concluded that it would be inappropriate to treat a manufacturer that was aware of a seemingly cosmetic dashboard issue as also aware of an additional, but hidden, safety concern related to that issue.

*Smith* involved some strange procedural twists—particularly regarding the plaintiffs' agreement that the court should apply a particular, out-of-circuit pleading standard—that make it somewhat difficult to know how to apply it as a precedent. *See Smith*, 988 F.3d at 886 (Stranch, J., concurring in judgment) (explaining background). Even if one assumes that *Smith* governs these issues in full, however, *Smith* relied on a context-dependent analysis that cannot simply be imported into this situation. It is one thing to argue that an automobile manufacturer that is only on notice that its dashboards tend to crack is also on notice about a significantly more severe, but

19

mostly latent, safety issue that is derivative of that problem. It makes a great deal less sense, however, when the argument is that an auto manufacturer could not have deduced a safety risk from its vehicles' failure to reliably accelerate in traffic.

Moreover, even if Nissan had somehow been ignorant of the possibility of safety risks arising from the alleged transmission problems, the customer complaints to which it had access were more than enough to disabuse it of that ignorance. The complaints submitted to NHTSA and allegedly monitored by Nissan included the following:

> WHILE DRIVING 50-55 MPH AND ATTEMPTING TO ACCELERATE, THE VEHICLE STALLED. . . . THE DEALER REPLACED THE VALVE ASSEMBLY, SEAL LIP, STRAINER ASSEMBLY, CLIP, OIL PAN GASKET, O-RING SEAL, WASHER DRAIN, AND NS-3 CVT TRANSMISSION; HOWEVER, THE FAILURE RECURRED. . . .
>
> AT 62,000 MILES THE TRANSMISSION FAILED AND THE CAR WOULD NOT DRIVE. WHILE HEADING HOME FROM WORK I FELT MY ENTIRE VEHICLE BEGIN TO SHAKE. THE VEHICLE WOULD NOT ACCELERATE WHEN I STEPPED ON THE GAS AND THERE WAS A 10 SECOND DELAY BEFORE IT BEGAN TO MOVE, AFTERWARDS, IT IMMEDIATELY JOLTED AND VIBRATED [V]IGOROUSLY. . . .
>
> TWICE ON THE HIGHWAY [I] HAD ISSUES WHERE THE CAR ACCELERATED ON ITS OWN AND A FEW TIMES [IT SEEMED] TO LOSE POWER AND [THEN] COMPENSATE AND COMPLETELY LAUNCH LEADING TO A QUICK JERKING MOTION. . . .
>
> Four times while I was driving the accelerator was unresponsive. Then the car completely died while driving. The problem is definitely a safety issue due to engine and accelerator stopping while driving. . . .
>
> My 2016 Maxima SL has a faulty CVT transmission. It shakes, stutters and has no power on acceleration. It is a safety concern because I could easily pull out into traffic and my car will not accelerate. . . .
>
> Transmission failed prematurely (77,000 miles) after placing me in multiple dangerous traffic situations. The car would fail to accelerate and eventually stall while I was turning or simply driving. Once it failed to accelerate when I was turning and I was almost struck by oncoming traffic! It was only the grace of God that saved me. . . .

My two kids were in the car with [me] all three times the accelerator stopped working while in motion due to the CVT transmission. All happened in Chicago city traffic. Luckily I was able to coast into a safe position each time but I was lucky not to get stuck in the middle of intersection. . . .

TRANSMISSION HAS BEEN IFFY. RANDOMLY SLIPPING RPMS. DRIVING DOWN THE HIGHWAY EVERYTHING SHUT OFF AND IT STOPPED IN THE MIDDLE OF THE ROAD MULTIPLE CARS NARROWLY MISSING ME. I COULD HAVE DIED BECAUSE OF A BROKEN TRANSMISSION! ONLY FOUR MONTHS OLD BOUGHT IT BRAND NEW ONLY 5K MILES ON IT. THIS IS NOT OKAY! THIS COULD HAVE KILLED ME AND PEOPLE AROUND ME! . . .

I AM SO MAD!!! I HAVE A 3 YEAR OLD AND I CANNOT RISK MY LIFE BECAUSE A BRAND NEW CAR STOPS IN THE MIDDLE OF THE HIGHWAY!!!! . . . .

CAR WOULD NOT DRIVE UPON PRESSURE OF THE GAS PEDAL PLACING DRIVER IN IMMEDIATE DANGER. DRIVER PULLED OVER MULTIPLE TIMES, SHIFTED CAR INTO PARK AND TURNED CAR OFF, PROCEEDED TO ATTEMPT TO DRIVE AGAIN. AFTER FOURTH TIME, THE TRANSMISSION/ENGINE RESPONDED.

(Doc. No. 38-1 at 1–11.)

Nissan's service bulletins provide further evidence of knowledge. *See Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 282 (E.D. Mich. 2021) (stating that knowledge can be inferred from applicable service bulletins). For example, Nissan issued a service bulletin regarding CVT "judder (shake, shudder, single or multiple bumps or vibration)" in April of 2016, well before these plaintiffs purchased their vehicles. (Doc. No. 38-2 at 45.) Later, a May 2019 service bulletin explicitly acknowledged Nissan Kicks models' having a capacity to "hesitate and/or have reduced power." (*Id.* at 65.)

The cited customer complaints and service bulletins occurred at various points during the relevant time period, and it appears that complaints became more common as time went on. The plaintiffs, therefore, may ultimately struggle to establish knowledge for each plaintiff's claim or, if a class is certified, the full class period. At this stage, however, all that the plaintiffs were

21

required to do was plead knowledge sufficiently, which they have done—particularly given the fact that the nature of this problem is such that it is implausible that it would have been wholly overlooked in the pre-release testing or early post-release monitoring that the plaintiffs have alleged occurred.

Even when a claim is governed by the heightened pleading requirements of Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). *Smith* expressly acknowledged this fact. *See Smith*, 988 F.3d at 883. It is a mistake, then, to read *Smith* as imposing some high evidentiary bar for the pleading of knowledge in an auto defect case. In fact, there is not an evidentiary bar at all, because a plaintiff, when drafting a complaint, "is not required to plead evidence," only assertions of fact. *McCall v. Scott*, 239 F.3d 808, 815 (6th Cir. 2001) (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)). Despite the lengthy analysis that the Sixth Circuit undertook to reach its conclusion in *Smith*, the plaintiffs' failure was a simple one: they failed to plead a plausible allegation that the defendant was aware of the dangerous nature of the defect involved. There is no such deficiency here, and therefore no ground for dismissal under *Smith*.

### 3. Timeliness of Count V

Nissan argues that, even if Busler has sufficiently alleged the substantive elements of an Arizona Consumer Fraud Act claim, the court should dismiss Count V as untimely. Typically, "[s]tatute-of-limitations defenses are [more] properly raised in Rule 56 motions [for summary judgment], rather than Rule 12(b)(6) . . . motions, because '[a] plaintiff generally need not plead the lack of affirmative defenses to state a valid claim.'" *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 359 F. Supp. 3d 546, 567 (E.D. Tenn. 2019) (quoting *Paulin v. Kroger Ltd. P'ship I*, No. 3:14-cv-669, 2015 WL 1298583, at *4 (W.D. Ky. Mar. 23, 2015)). However, if it is

22

"'apparent from the face of the complaint that the time limit for bringing the claim[s] has passed,'" then the plaintiff, if he wishes to avoid dismissal, has an "obligation to plead facts in avoidance of the statute of limitations defense." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)). When "the allegations in the complaint affirmatively show that a claim is time-barred," then "dismissing the claim under Rule 12(b)(6) is appropriate." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).

Arizona Consumer Fraud Act claims are subject to the state's general one-year statute of limitations for statutory causes of action. Ariz. Rev. Stat. Ann. § 12-541(5); *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1045 (9th Cir. 2011). That statute of limitations is to be calculated from the date when the plaintiff "discover[ed] or with reasonable diligence could have discovered" that she was wrongfully injured. *Alaface v. Nat'l Inv. Co.*, 181 Ariz. 586, 591, 892 P.2d 1375, 1379 (Ct. App. 1994). Busler asserts that she purchased her 2019 Nissan Kicks in August of 2020 and began experiencing transmission problems within four mouths—that is, by around December of the same year. (Doc. No. 38 ¶¶ 21–25.) She did not complain to her dealership, however, until January 2022, at which point the dealership failed to remedy the problem. (*Id.* ¶ 26.) The initial Complaint was filed on September 30, 2022—less than a year after her complaint to the dealership but more than a year after the problems first arose. (Doc. No. 1.)

There does appear to be a meaningful possibility that Busler's claim is untimely. Busler, however, argues that resolving that issue at this stage would be inappropriate, and the court agrees. Nissan's argument assumes that Busler's cause of action necessarily accrued as soon as she began to experience problems with her vehicle, but, under Arizona law, a cause of action does not accrue until the plaintiff "possess[es] a minimum requisite of knowledge sufficient to identify that a

23

wrong occurred and caused injury." *Doe v. Roe*, 191 Ariz. 313, 323, 955 P.2d 951, 961 (1998) (citing *Lawhon v. L.B.J. Institutional Supply, Inc.*, 159 Ariz. 179, 183, 765 P.2d 1003, 1007 (Ct. App. 1988)). Automobiles malfunction routinely, even without the presence of a preexisting defect. The question of when Busler was on reasonable discovery notice that her vehicle was actually defective depends on the details and timeline of her vehicle's specific problems, which she did not—and was not required to—plead in detail. The court accordingly will permit Count V to proceed, without prejudice to the issue of timeliness being raised at a later date.

### 4. Georgia Uniform Deceptive Trade Practices Act

The Georgia Uniform Deceptive Trade Practices Act ("GUDTPA"), like the other consumer protection statutes at issue in this case, forbids certain business practices that have been deemed harmful to consumers. *See* Ga. Code Ann. § 10-1-372. Unlike those statutes, however, GUDTPA provides only for injunctive relief. *See Catrett v. Landmark Dodge, Inc.*, 253 Ga. App. 639, 644, 560 S.E.2d 101, 106 (2002) (citation omitted). Although much of the Amended Complaint focuses on the plaintiffs' and prospective class members' monetary injuries, the plaintiffs do request injunctive relief in the following form:

> An order enjoining Nissan from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Nissan to issue a voluntary recall for the Class Vehicles pursuant to. 49 U.S.C. § 30118(a); compelling Nissan to remove, repair, and/or replace the Class Vehicles' defective CVT and/or its components with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Nissan from selling the Class Vehicles with the misleading information; and/or compelling Nissan to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed . . . .

(Doc. No. 38 at 46.) Nissan nevertheless argues that "Young does not plead any facts showing that she has standing to seek injunctive relief" and that the court should therefore dismiss Count VII. (Doc. No. 42 at 17.)

24

When a plaintiff seeks injunctive relief, the plaintiff must demonstrate that there is a non-speculative, imminent threat of ongoing or repeated injury to establish that there is a redressable injury-in-fact. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *Fieger v. Mich. Supreme Court*, 553 F.3d 955, 966 (6th Cir. 2009). "[T]he plaintiff must show 'that he personally would benefit in a tangible way from the court's intervention.'" *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 670 (6th Cir. 2007) (quoting *Warth v. Seldin*, 422 U.S. 490, 505, 508 (1975)). Moreover, injunctive relief is available only where "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

If Young had alleged only that she was harmed by the CVT defect in the past, it might well be possible to conclude that injunctive relief would be inappropriate and that the court should therefore dismiss any claim dependent on such a request. Young, however, has alleged that she still has her Nissan vehicle and anticipates needing future repairs or maintenance, because her transmission still does not work as desired. It is therefore possible that she would benefit from injunctive relief requiring Nissan to, for example, perform certain repairs upon request. The court, moreover, cannot assume that monetary damages alone would be sufficient to address the potential need for future repairs.

Although the primary focus of the plaintiffs' claims may be economic, the question of whether a plaintiff possesses standing to seek injunctive relief does not depend on whether her request for such relief is of central importance to her litigation objectives or is simply a secondary concern. What matters is the nature of the plaintiff's concrete and personalized injuries. Because Young has pleaded ongoing and/or possible future injuries for which injunctive relief would be appropriate, the court will not dismiss Count VII.

<u>4. Class Action Bar</u>

The Georgia Fair Business Practices Act states that a plaintiff "may bring an action individually, but not in a representative capacity." Ga. Code Ann. § 10-1-399(a). The Alabama Deceptive Trade Practices Act has a similar, but more detailed, set of provisions forbidding plaintiffs from pursuing claims on behalf of others:

> (f) A consumer or other person bringing an action under this chapter may not bring an action on behalf of a class. The limitation in this subsection is a substantive limitation and allowing a consumer or other person to bring a class action or other representative action for a violation of this chapter would abridge, enlarge, or modify the substantive rights created by this chapter.

> (g) Notwithstanding the limitation in subsection (f), only the office of the Attorney General or district attorney shall have the right and authority to bring action in a representative capacity on behalf of any named person or persons. In any such representative action brought by the office of the Attorney General or a district attorney, the court shall not award minimum damages or treble damages, but recovery shall be limited to actual damages suffered by the person or persons, plus reasonable attorney's fees and costs.

Ala. Code § 8-19-10(f)–(g). Those provisions would prevent Young and Kirksey from pursuing class actions in the courts of their respective states.

The right to pursue a class action in federal court, however, does not arise out of the underlying claims themselves, but rather Rule 23 of the Federal Rules of Civil Procedure, which is entitled to the full preemptive force afforded to federal law under the Supremacy Clause of the U.S. Constitution. Rule 23 requires a federal district court to "certify a class in each . . . case where the Rule's criteria are met." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399 (2010) (internal quotation omitted). Where a state procedural law instructs a federal district court to disregard Rule 23, then, the federal court typically must disobey that instruction as inconsistent with binding and applicable federal law governing the question presented. *Id.*

26

"That does not mean, however, that the federal rule always governs." *Id.* at 417 (Stevens, J., concurring in part and in judgment). The case in which the Supreme Court announced these principles had a divided majority, and courts have largely concluded that the scope of its holding is set by Justice Stevens' concurrence, which leaves open the possibility for some state class action limitations to survive in federal court. *See In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1165 (D. Minn. 2014) (collecting cases). Justice Stevens agreed with the other members of the majority that states cannot override federal procedural rules, but he allowed for the possibility that some state laws limiting class action rights might be *substantive* limitations on the causes of action at issue—not purely procedural edicts—and therefore avoid any conflict with Rule 23.

Justice Stevens acknowledged that the resultant rule was "'hazy'" and would "require[] careful interpretation of the state and federal provisions at issue." *Shady Grove*, 559 U.S. at 419 (Stevens, J., concurring in part and in judgment) (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64, 92 (1938)). Generally speaking, though, Justice Stevens stated that the court should look to whether the state rule at issue is "so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." *Shady Grove*, 559 U.S. at 420 (Stevens, J., concurring in part and in judgment). Nissan argues that the class action bars in the Georgia Fair Business Practices Act and the Alabama Deceptive Trade Practices Act are applicable in federal court based on that principle.

The Alabama Deceptive Trade Practices Act was amended in 2016 to add language that appears to have been specifically drafted in an attempt to survive a Rule 23 preemption analysis. *See* 2016 Alabama Laws Act 2016-407 (S.B. 270). The class action bar in the Georgia Fair Business Practices is comparatively bare-bones, but some federal courts have concluded that it

27

survives a preemption analysis. *See Danielkiewicz v. Whirlpool Corp.*, 426 F. Supp. 3d 426, 438 (E.D. Mich. 2019); *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427 (NGG) (ST), 2017 WL 5201079, at *10 (E.D.N.Y. Nov. 9, 2017). Other courts, however, have found the Georgia provision preempted by Rule 23. *See Andren v. Alere, Inc.,* No. 16CV1255-GPC(AGS), 2017 WL 6509550, at *22 (S.D. Cal. Dec. 20, 2017) (collecting cases).

Nissan argues first that the court must conclude that the Georgia class action bar is bound up with substantive rights and remedies because the language forbidding class actions "cannot be excised without dismembering the very statute which gives [Young] the ability to bring an action in the first place." (Doc. No. 42 at 17.) That argument, however, is unpersuasive. For one thing, it is simply not true that the relevant language cannot be removed from the statute without "dismembering" it. When one excises the relevant language, one is left with the following entirely intelligible language: "Any person who suffers injury or damages as a result of a violation of Chapter 5B of this title, as a result of consumer acts or practices in violation of this part . . . or whose business or property has been injured or damaged as a result of such violations may bring an action . . . against the person or persons engaged in such violations . . . ." Ga. Code Ann. § 10-1-399(a). If anything, the relevant language is unusually easy to excise without otherwise changing the statute. Nissan's hyperbolic language about dismemberment overstates the argument that it appears actually to be making: that a class action bar can avoid preemption simply by being located in, and applying specifically to, a single state statute. *See Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 61 (E.D.N.Y. 2017) (collecting cases holding that *Shady Grove* applies only to "pan-substantive" rules).

It is, however, difficult to reconcile such a rule with the one set forth and discussed in Justice Stevens' opinion. Justice Stevens was clear that the test he envisioned was a nuanced and

28

searching one, based on a close reading of both the federal and state laws at issue. Nissan instead offers a purely mechanical rule whereby preemption is determined entirely by how and where a rule happens to be codified. This court cannot reconcile that approach with Justice Stevens' opinion. The court is similarly unpersuaded by Alabama's bare statutory assertions that its rule is substantive. The test set forth by the Supreme Court looks to whether the relevant provision *is* bound up with the substance of the statute, not whether it merely *describes itself* as such.

If those were the only arguments in favor of applying the state class action bars, the court would be unlikely to do so. There is, however, an additional consideration that, the court ultimately concludes, does render these particular class action bars inextricably bound up with the substance of the underlying statutory schemes: the role of the class action bars in dividing responsibilities between private plaintiffs and the government. Each statute creates what is typically referred to as a "dual enforcement scheme," involving both private enforcement by individual plaintiffs and direct enforcement by the government. *Mitchell v. Cellone*, 389 F.3d 86, 90 (3d Cir. 2004). Specifically, each statute empowers the respective state's attorney general to make enforcement decisions under the statute's terms, aside from any purely private litigation. *See* Ala. Code §§ 8-19-4, 8-19-8; Ga. Code Ann. §§ 10-1-395 to -398.1. As a result—and as the Alabama statute expressly acknowledges—these class action bars do not simply deprive plaintiffs of a procedural option; they also, in effect, reserve certain powers to the government itself, a policy choice with significant substantive consequences. *See* Ala. Code § 8-19-10(g).

Under both Georgia's statute and Alabama's, the Attorney General is granted substantial powers to enforce consumer protections on behalf of the individuals of the state. That discretionary enforcement power represents a meaningful tool of public policymaking that would be undermined if individual plaintiffs could, by bringing a putative class action, effectively bring about a state-

29

wide enforcement action. *See Bearden v. Honeywell Int'l Inc.*, No. 3:09-1035, 2010 WL 3239285, at *10 (M.D. Tenn. Aug. 16, 2010) ("[T]he class-action limitation reflects a policy that the proper remedy for a violation affecting a class of consumers is prosecution by the Attorney General . . . ."). If this court held that Rule 23 preempted the Georgia and Alabama class action bars, it would effectively be doing away with an important substantive allocation of responsibilities adopted by the legislatures of those states. The court will therefore find no preemption and will dismiss Counts IV and VI, without prejudice to any future assertion of the underlying claims in Kirksey's or Young's purely individual capacity.

### G. Unjust Enrichment (Count VIII)

"Unjust enrichment applies when . . . there is no legal contract, but . . . the [defendant] has been conferred a benefit by the [plaintiff] which the [defendant] equitably ought to return or compensate for." *Owens v. Larry Franklin Properties, Inc.*, 363 Ga. App. 362, 367, 870 S.E.2d 218, 222–23 (2022) (quoting *Engram v. Engram*, 265 Ga. 804, 806, 463 S.E.2d 12, 15 (1995)); *see also Blackmon v. Renasant Bank*, 232 So. 3d 224, 229 n.4 (Ala. 2017) ("We . . . note that [plaintiff's] unjust-enrichment claim . . . and its breach-of-contract claim . . . are mutually exclusive."); *Hiatt v. Melhorn*, No. 1 CA-CV 08-0727, 2009 WL 4981486, at *5 (Ariz. Ct. App. Dec. 22, 2009) ("If there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.") (internal quotation omitted). Nissan argues that all of the issues raised by the plaintiffs are covered by their vehicles' warranties and that the court therefore should dismiss Count VIII.

In response, the plaintiffs point out that courts routinely allow plaintiffs to pursue contractual claims and unjust enrichment claims as alternative theories of recovery. That is true, but it does not mean that doing so is appropriate in every case. If there is any reasonable possibility

of the parties' disagreeing about whether a contract exists, whether it binds a particular party, or whether it reaches a certain subject matter, then there may well be plausible scenarios in which a plaintiff alleging breach of contract would nevertheless succeed under an unjust enrichment theory. Such a claim therefore must be allowed to proceed based on the principle that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). A claim pleaded in the alternative, however, is just like any other claim challenged pursuant to Rule 12(b)(6) and must be dismissed if the operative complaint pleads no plausible version of the facts that would support that claim.

The plaintiffs have specifically alleged that Nissan sold each of the vehicles at issue in this case with a powertrain warranty that covered the CVT. (Doc. No. 38 ¶ 5.) None of the individual named plaintiffs' allegations suggest that Nissan ever disputed that the warranties existed or that CVT was within the scope of the respective warranties. (*Id.* ¶¶ 21–44.) There is, accordingly, no plausible reading of the allegations of the Complaint, or any subset of those allegations, that would support a conclusion that the subject matter of this case was not covered by the warranties themselves. There is therefore no basis for permitting the unjust enrichment claims to proceed as an alternative theory of liability, and the court will dismiss Count VIII.

**H. Fraudulent Omission (Count IX)**

Nissan's primary argument for dismissing Count IX is also the primary argument that it advanced with regard to Counts IV, V, and VI: the plaintiffs have failed to identify a specific defect and failed to plead Nissan's knowledge of that defect adequately. Those arguments fail for the reasons that the court has already discussed. However, Nissan also raises an argument specific to Kirksey's assertion of Count IX. Nissan argues that "Alabama law is clear that when parties to a business transaction deal at arm's length, there is no duty to disclose unless the information has

been requested" and that, absent such a duty, there can be no cause of action for fraudulent omission. (Doc. No. 42 at 19.) They rely, in particular, on the Alabama Supreme Court's statement in *Mason v. Chrysler Corp.*, 653 So. 2d 951 (Ala. 1995), that, "[w]hen the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested." *Id.* at 954–55 (citations omitted).

The plaintiffs urge the court instead to follow the analysis of the Southern District of New York, which addressed this issue under Alabama law in *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 408 (S.D.N.Y. 2017), which, like this case, involved allegedly defective vehicles. That court concluded that, while Alabama law generally limits the duty to disclose, a duty may arise based on the facts of the underlying situation, particularly (1) whether the defendant actively concealed the defect and (2) whether the defect was dangerous. *See id.*

The plaintiffs' reading of Alabama law appears to be the correct one. Although the defendants have identified isolated language in *Mason* suggesting that there is only one way in which a duty to disclose might arise in this situation, the very same opinion makes clear that that is not the case. To the contrary, under Alabama law, "whether one has a duty to speak depends upon a fiduciary, or other, relationship of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances of the case." *Mason*, 653 So. 2d at 954 (collecting authorities). The Southern District of Florida, like the Southern District of New York, has applied that standard to hold that, at the pleading stage, a plaintiff's assertion that an auto manufacturer actively concealed a dangerous defect is sufficient to plead that a duty to disclose arose out of the circumstances of the case. *See In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1338 (S.D. Fla. 2016). This court agrees, and it, therefore, will not dismiss Count IX.

## IV. CONCLUSION

For the foregoing reasons, Nissan's Motion to Dismiss Plaintiffs' Amended Class Action Complaint (Doc. No. 41) will be granted in part and denied in part. Counts I and III will be dismissed as to Kirksey, Count II will be dismissed as to Busler and Kirksey, Counts IV and VI will be dismissed without prejudice to the plaintiffs pursuing those claims in an individual capacity, and Count VIII will be dismissed. The other claims will remain pending.

An appropriate order will enter.


_____
ALETA A. TRAUGER
United States District Judge